UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLEY G., <br><br> Plaintiff, <br><br> v. <br><br> KILOLO KIJAKAZI, Acting Commissioner of Social Security, <br><br> Defendant. | Case No.:  21cv572-RBB <br><br> **ORDER REGARDING JOINT MOTION FOR JUDICIAL REVIEW; ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT [ECF NO. 17]** |

On April 1, 2021, Plaintiff Carley G.[1] commenced this action against Defendant Andrew Saul, Commissioner of Social Security, for judicial review under 42 U.S.C. § 405(g) of a final adverse decision for supplemental security income benefits [ECF No.

---

[1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

1

1].[2]  On December 10, 2021, Defendant filed the Administrative Record [ECF No. 14]. On May 10, 2022, the parties filed a joint motion for judicial review of final decision of the Commissioner of Social Security [ECF No. 17].  Following the transfer of this matter from Magistrate Judge Bernard G. Skomal to Magistrate Judge Ruben B. Brooks, Plaintiff consented to have this Court conduct all proceedings on July 21, 2022 [ECF No. 20].[3]

For the following reasons, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Cross-Motion for Summary Judgment is **GRANTED**.

## I.   BACKGROUND

Plaintiff Carley G. was born in 1994 and has a GED equivalency certificate. (Admin. R. 50, 446, ECF No. 14.)[4]  She previously worked part-time at a pizza restaurant and Subway sandwich shop.  (Id. at 51-52.)  On or about July 9, 2018, Plaintiff filed an application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  (Id. at 26, 443.)  She alleged that she had been disabled since August 1, 2016, due to gastroparesis and schizophrenia.  (Id. at 445, 453.)  Carley G.'s applications were denied on initial review and again on reconsideration.  (Id. at 367-71, 375-80.)  An administrative hearing was conducted telephonically on April 1, 2020, by Administrative Law Judge ("ALJ") Kevin W. Messer.  (Id. at 43.)  On April 23, 2020, the ALJ issued a decision and concluded that Carley G. was not disabled.  (Id. at 26-38.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council denied the request on

---

[2] Kilolo Kijakazi is now the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).
[3] The United States has informed the Court of its general consent to Magistrate Judge jurisdiction in cases of this nature. See S.D. Cal. Gen. Order No. 707 (Apr. 12, 2019).
[4] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF"). For all other documents, the Court cites to the page numbers affixed by CM/ECF.

1  February 16, 2021.  (Id. at 1-7.)  Plaintiff then commenced this action pursuant to 42
2  U.S.C. § 405(g).

## II.   LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C.A. § 405(g), 421(d) (West 2020).  The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014).  Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)); see also Biestek v. Berryhill, ___ U.S. ___, ___, 139 S. Ct. 1148, 1154, 203 L. Ed. 2d 504 (2019).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005); Ford v. Saul, 950 F.3d 1141, 1154 (9th Cir. 2020).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the Social Security Administration for further proceedings.  Id.

To qualify for SSI benefits under the Social Security Act, a claimant must be determined to be disabled, defined as the inability to perform substantial gainful activity due to a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve

months or more.  See 20 C.F.R. § 416.905 (2019).  The Commissioner makes this assessment by employing a five-step analysis outlined in 20 C.F.R. § 416.920.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999) (describing five steps set forth in 20 C.F.R. § 404.1520).[5]  The burden of proof is on the claimant at steps one through four.  Id. at 1098.  First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  20 C.F.R. § 416.920(b) (2019).  Second, the Commissioner determines whether the claimant has a "severe impairment or combination of impairments" that significantly limits the claimant's physical or mental ability to do basic work activities.  If not, the claimant is not disabled.  Id. § 416.920(c).  Third, the medical evidence of the claimant's impairment is compared to a list of impairments that are presumed severe enough to preclude work; if the claimant's impairment meets or equals one of the listed impairments, benefits are awarded.  Id. § 416.920(d).  If not, the claimant's residual functional capacity is assessed and the evaluation proceeds to step four.  Id. § 416.920(e).  Fourth, the Commissioner determines whether the claimant can do his or her past relevant work.  If the claimant can do their past work, benefits are denied.  Id. § 416.920(f).  If the claimant cannot perform his or her past relevant work, the burden shifts to the Commissioner.  In step five, the Commissioner must establish that the claimant can perform other work.  Id. § 416.920(g).  If the Commissioner meets this burden and proves that the claimant is able to perform other work that exists in the national economy, benefits are denied.  Id.

/ / /

/ / /

/ / /

---

[5] The disability insurance benefits (DIB) and supplemental security income (SSI) regulations are virtually identical.  Parallel SSI regulations are found in 20 C.F.R. §§ 416.900–416.999 and correspond with the last digits of the DIB citations (e.g., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

4

## III.   DISCUSSION

### A.   ALJ's Decision

ALJ Messer determined at step one that Plaintiff had not engaged in substantial gainful activity since July 9, 2018, the date of Plaintiff's SSI application (step one). (Admin. R. 28, ECF No. 14.)  At step two, he found that Carley G.'s severe impairments included gastroparesis status-post implantation of a gastric stimulator, irritable bowel syndrome, anxiety, cognitive impairment, and schizophrenia.  (Id. at 29.)  He determined at step three that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.  (Id. at 30.)  He then found that Carley G. retained the residual functional capacity to perform light work but was limited to occasional climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; understanding, remembering, and carrying out simple, routine tasks; only occasional interaction with the general public and occasional work-related, non-personal, non-social interaction with co-workers and supervisors; and jobs requiring only simple work-related decisions. (Id. at 31.)  At step four, ALJ Messer determined that Plaintiff did not have any past relevant work.  (Id. at 36.)  Nevertheless, she was capable of performing the requirements of the representative occupations of housekeeping cleaner, assembler, and marker (step five).  (Id. at 37.)  Accordingly, the ALJ found that Carley G. had not been under a disability since July 9, 2018.  (Id.)

### B.   The Parties' Arguments

Plaintiff argues that the ALJ's finding that she can perform light work on a sustained basis lacks the support of substantial evidence and is the result of legal error. (Joint Mot. 4, ECF No. 17.)  Specifically, she claims that she has required thirty-nine days of emergency room treatment or hospitalization since August 1, 2016, her alleged onset date, which she contends undermines the ALJ's determination that she can perform

1  work on a regular and continuous basis.  (Id. at 5-9.)  Carley G. asserts that at a
2  minimum, she should be granted a closed period of disability from 2016 through 2019.
3  (Id. at 10 n.2.)  The Commissioner argues that the relevant period in SSI cases is from the
4  application date through the date of the ALJ's decision; here, July 9, 2018, through April
5  23, 2020.  (Id. at 14, 17.)  Defendant maintains that while Plaintiff may have frequently
6  received emergency treatment before the relevant period, she has provided only
7  tangential evidence of emergency room visits or hospitalizations during the time period in
8  question.  (Id. at 12.)  In response, Plaintiff contends that the ALJ was required to
9  consider evidence preceding her application date.  (Id. at 22.)

10 **C.    Relevant Period for Determination of SSI benefits**

11       The purpose of SSI benefits is to assure a minimum level of income for aged,
12  blind, or disabled individuals who are unable to maintain a standard of living at the
13  federal minimum income level.  20 C.F.R. § 416.110 (2019).  An SSI claimant must be
14  found to be disabled during the period her application is pending and may not receive
15  benefits for any month prior to the one in which she applied for SSI.  See 42 U.S.C.A. §
16  1382(c)(7) (West 2018); see also 20 C.F.R. § 416.335 (2019) ("If you file an application
17  after the month you first meet all the other requirements for eligibility, we cannot pay you
18  for the month in which your application is filed or any months before that month.");
19  Hawthorne v. Astrue, 493 F. Supp. 2d 838, 842 (S.D. Tex. 2007) ("A claimant applying
20  to the SSI program cannot receive payment for any period of disability predating the
21  month in which he applies for benefits, no matter how long he has actually been
22  disabled.").

23       In this case, Carley G. must establish that she was disabled during the period her
24  application was pending, that is, between July 9, 2018, the date of her SSI application,
25  and April 23, 2020, the date of the ALJ's decision.  See 20 C.F.R. § 416.335; see also
26  Rounds v. Comm'r Soc. Sec. Admin., 807 F.3d 996, 999–1000 (9th Cir. 2015) (citing 20

C.F.R. § 416.335). Plaintiff's argument that the ALJ should have evaluated her for a closed period of disability from 2016 to 2019 is therefore flawed, because the earliest date on which the ALJ could have found her disabled was July 9, 2018.[6]

Plaintiff correctly observes that the SSA is generally required to consider evidence for at least the twelve months preceding the month in which a claimant files her application, unless there is reason to believe that development of an earlier period is necessary. See 20 C.F.R. § 416.912(b)(1) (2019). The Commissioner bears responsibility for developing this evidence by making "every reasonable effort" to help a claimant obtain medical evidence from her medical sources. Id. Thus, Carley G.'s medical records dated from at least July 9, 2017, and earlier, if necessary, were relevant to the ALJ's consideration of Plaintiff's claim, even though she could not have received SSI benefits until August 2018.

**D.   Residual Functional Capacity Analysis**

When evaluating a claimant's physical and mental abilities for purposes of determining residual functional capacity, the ALJ must "first assess the nature and extent of your . . . limitations and then determine your residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 416.945(b), (c) (2019). A "regular and continuing basis" is defined as eight hours a day, for five days a week, or an equivalent work schedule. SSR 96-8P, 1996 WL 374184, at *1 (July 2, 1996). Residual functional capacity "does not represent the least an individual can do despite his or her limitations or restrictions, but the most." Id. at *2.

/ / /

/ / /

---

[6] In contrast, a claimant qualifies for disability insurance benefits ("DIB") if her disability begins by her date last insured, and these benefits can be paid for up to twelve months before her application was filed. See 42 U.S.C.A. § 423(a)(1), (c)(2), (d)(1)(A) (West 2020).

Here, Plaintiff contends that her gastroparesis[7] has resulted in thirty-nine days of emergency room treatments or hospitalizations since August 2016.  (Joint Mot. 9, ECF No. 14.)  She argues that ALJ Messer's determination of her residual functional capacity is not supported by substantial evidence and constituted legal error because he failed to address whether Carley G.'s frequent visits to the emergency room and hospitalizations rendered her unable to perform work on a regular and continuing basis.  (Id. at 9-10.)  Defendant counters that "[w]hile Plaintiff may have frequently received emergency treatment before the relevant period, [she] presents only tangential evidence of emergency room visits and/or hospitalization during the relevant period."  (Id. at 12.)

ALJ Messer recounted Plaintiff's testimony that flares of her gastroparesis required eight to ten emergency room visits a year due to intractable vomiting and abdominal pain.  (Admin. R. 32, ECF No. 14 (referring to id. at 54).)  He summarized medical evidence relating to the placement of a gastric pacemaker in August 2016 and several brief hospitalizations in 2016 and 2017 due to complications of her gastroparesis, including dehydration, nausea, vomiting, and hypokalemia (low potassium).  (Id. at 33.)  He concluded, however, that the medical evidence did not "wholly support the intensity, persistence, or limiting effects" that Plaintiff ascribed to her gastroparesis.  (Id.)  The ALJ stated the following regarding Carley G.'s condition following her application date:

> The claimant's allegation of eight to ten emergency room visits per year for her gastrointestinal symptoms are not consistent with the medical evidence of record.  While there are notations of emergency room visits in the record, the last of these was in April of 2018.  Since the application date, incidental notations of emergency room visits appear in treatment records

---

[7] Gastroparesis is a condition in which the patient's stomach cannot empty itself of food in a normal manner.  Individuals with gastroparesis may have damaged nerves and muscles that do not function with normal strength and coordination, resulting in the slowing of the movement of contents through the digestive system.  See Cleveland Clinic, https://my.clevelandclinic.org/health/diseases/15522-gastroparesis#:~:text=Gastroparesis%2C%20which%20means%20partial%20paralysis,contents%20through%20your%20digestive%20system (last visited Oct. 3, 2022).

> with her physical medicine and rehabilitation physician; however, there are no actual records of emergency room visits in evidence after the date of application. Additionally, examinations by her physical medicine and rehabilitation doctor since the application date have been grossly normal, aside from notations of moderate abdominal tenderness. Significantly, examinations by her gastroenterologist have generally been grossly normal. He regularly noted that the claimant's abdomen was non-tender with normal bowel sounds.

(Id. (citations omitted).)

The ALJ's evaluation of the evidence is supported by the record. On August 4, 2016, Plaintiff, who lived in Louisiana at the time, was evaluated by Dr. William S. Richardson for severe nausea and episodic vomiting that she had experienced since March 2014. (Id. at 734.) Dr. Richardson diagnosed Carley G. with idiopathic gastroparesis, (see id. at 736), and surgically implanted a gastric neurostimulator on August 22, 2016. (Id. at 722.) Although she had some improvement in her symptoms following the placement of the gastric stimulator, (see, e.g., id. at 673), she continued to experience gastroparesis symptoms leading to numerous and frequent visits to the emergency room and hospital in 2016 and 2017. (See id. at 647, 670 (Dec. 17-19, 2016 hospital admission); 641-42 (Dec. 20, 2016 emergency department ("ED") visit); 624, 638-39 (Dec. 21-22, 2016 hospital admission); 586 (Feb. 18, 2017 ED visit); 583 (Feb. 23, 2017 ED visit); 505 (Feb. 23-24, 2017 hospital admission); 578 (Feb. 25, 2017 ED visit); 574 (Feb. 26, 2017 ED visit); 618-19 (Mar. 29, 2017 ED visit); 599-601 (May 30, 2017 ED visit); 595 (May 31, 2017 ED visit); 571 (July 18, 2017 ED visit); 504 (July 18-20, 2017 hospital admission); 565-66 (July 22, 2017 ED visit); 560 (Aug. 1, 2017 ED visit); 557 (Aug. 2, 2017 ED visit); 550 (Aug. 3, 2017 ED visit); 503 (Aug. 3-5, 2017 hospital admission); 546-47 (Aug. 17, 2017 ED visit); 1102 (Aug. 18, 2017 ED visit); 541 (Aug. 19, 2017 ED visit); 1087 (Aug. 20, 2017 ED visit); 536-37 (Aug. 28, 2017 ED visit); 530-31 (Aug. 31, 2017 ED visit); 1105-06 (Sept. 1, 2017 ED visit); 528 (Sept. 2,

1  2017 ED visit); 1110-11 (Sept. 3, 2017 ED visit); 524 (Sept. 13, 2017 ED visit); 519
2  (Sept. 16, 2017 ED visit); 516 (Oct. 10, 2017 ED visit).

3        Plaintiff was generally treated for abdominal pain, nausea, vomiting, and
4  dehydration during her emergency room and hospital visits, and often requested and
5  sometimes received Dilaudid (an opioid) or other medication to control her pain.  (See,
6  e.g., id. at 583-84 (presented with epigastric pain, nausea, and vomiting at ED and stated
7  that she was normally treated with Dilaudid or morphine); 573 ("Patient repeatedly asked
8  for IV pain medicine specifically Dilaudid which she says is usually what she needs to
9  help.  Patient was told repeatedly that she would not be getting pain medicine for this
10 condition."); 550 ("requesting morphine or Dilaudid"); 1104 (emergency room record
11 stating that Plaintiff "did have a benign abdominal exam; however, her subjective
12 complaints were met with 1mg of IV Dilaudid").)

13       Notably, the multiple emergency and hospital visits between July 18, 2017, and
14 September 3, 2017, occurred after Plaintiff moved from Louisiana to San Diego, before
15 she established care with a new gastroenterologist.  See, e.g., id. at 510 (July 18, 2017
16 emergency room record stating that Carley G. "moved to this area a few months ago");
17 550 (Aug. 3, 2017 ED report indicating that Plaintiff "has not set up GI here, but was
18 referred to UCSD yesterday, has not called them yet"); 1108 (Sept. 2, 2017 ED physician
19 notation that "I did not feel the patient required acute care hospitalization or observation.
20 . . . [S]he needs to follow up with physician and gastroenterologist.  She was referred . . .
21 to Dr. [Heinz Juergen] Lenz on [a] number of occasions.").)  Carley G. finally saw Dr.
22 Lenz on September 6, 2017, who recommended that Plaintiff manage her gastroparesis
23 with her existing prescriptions of Reglan and Protonix, and added a prescription for
24 Librax three times daily for her abdominal spasms.  (Id. at 1147-48.)

25       Plaintiff's medical records from 2018 reflect only three visits to the emergency
26 department, including two on the same day, which was a marked reduction from the

previous two years. (See id. at 1114 (Mar. 18, 2018 ED visit); 1112, 1118 (two ED visits on Apr. 23, 2018.) As observed by the ALJ, the medical evidence of record contains incidental notations reflecting emergency room visits in 2019, but no actual emergency room records. For example, on or about May 26, 2019, over a year after her last emergency room visit, Dr. Lenz, Plaintiff's gastroenterologist, prepared a treatment note stating, "The patient had run out of Librax which may or may not have prompted her intractable nausea and vomiting to the degree that she was unable to hydrate herself and required admission through the emergency department." (Id. at 1223.) On August 14, 2019, Plaintiff reported to Dr. Lenz that she had been hospitalized four times since her last appointment with him, which took place four months earlier on May 22, 2019. (Id. at 1218, 1220.) This statement, however, is contradicted by other evidence in the record. On November 14, 2019, Carley G. told Dr. Ron Brizzie, her physical medicine and rehabilitation physician, that she had not been to the hospital since June. (Id. at 1231.) In short, while there is ample evidence of documented emergency room visits between December 2016 and April 2018, there are no actual emergency room or hospital records dated after Plaintiff filed her application for SSI benefits. The records from the relevant time period thus do not support Plaintiff's argument that the ALJ failed to factor in her emergency department visits and hospitalizations in formulating her residual functional capacity.

Furthermore, as ALJ Messer observed, the medical evidence following the filing of Plaintiff's application reflect improvement in her condition and undermine her contention of disability. Indeed, there are no records of any treatment of Plaintiff's gastroparesis between her July 9, 2018 application and March 7, 2019, when she followed up with Dr. Brizzie. (Id. at 1267.) On that date, Carley G. reported that her overall pain level was 2 or 3 out of 10, down from 7 out of 10 reported during her last visit on June 28, 2018. (Id. at 1162, 1267.) On May 22, 2019, Dr. Lenz, the

gastroenterologist, stated that his patient benefited greatly from the combination of Reglan, Protonix, and Librax, and noted an unremarkable abdominal examination. (Id. at 1220-21.) On August 14, 2019, Dr. Lenz again found that Carley G.'s abdominal examination was unremarkable. (Id. at 1219.) He noted that Plaintiff was under the care of a pain specialist who prescribed an opiate-containing pain patch. (Id. at 1218.) The doctor expressed concern about this:

> I had a lengthy discussion with the patient regarding her gastroparesis, abdominal pain and opiate dependence. I pointed out that opiate analgesics may aggravate or even cause gastroparesis. In that regard an[] attempt should be made to decrease the dose or discontinue opiate-containing analgesics altogether[.] I pointed out to the patient that in my career of 30 years and hav[ing] seen many patients with gastroparesis, . . . I have never seen the patient requiring opiate analgesics for symptoms related to her gastroparesis. The patient countered that she was in [a] support group where the majority of gastroparesis patients required opiate-containing analgesics. She found that support group through the Internet. Nevertheless, the fact remains that opiate-containing analgesics delay gastric emptying and hence may contribute rather than solve her problems.

(Id. at 1219.) Finally, although Plaintiff dealt with gynecological issues in the latter half of 2019, (see, e.g., id. at 1275 (lab report reflecting severe dysplasia, a pre-cancerous condition); 1291 (colposcopy of cervix performed on October 2, 2019); 1217 (Plaintiff's report that she had been diagnosed with cervical cancer for which she planned to undergo cryoablation)), her abdominal symptoms remained stable, (see id. at 1216).

The record does not support Plaintiff's argument that the ALJ should have found that emergency room visits and hospitalizations during the relevant period prevented her from performing work on a regular and continuous basis. The Court finds that the ALJ's determination that Plaintiff retained the residual functional capacity to perform light work, subject to additional limitations, was supported by substantial evidence and was not based on legal error. See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (stating that a court must affirm the ALJ's RFC determination if the ALJ applied the

proper legal standard and his decision is supported by substantial evidence) (citation omitted); see also Sandgathe 108 F.3d at 980 ("Substantial evidence is more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (internal quotations omitted).

### IV.   CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Cross-Motion for Summary Judgment is **GRANTED**.

This Order concludes the litigation in this matter.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  November 15, 2022

*/s/ Ruben Brooks*
Hon. Ruben B. Brooks
United States Magistrate Judge